IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

BERTHA BALTAZAR                                              PLAINTIFF

          v.                     Civil No. 09-2146

MICHAEL J. ASTRUE, Commissioner of
Social Security Administration                              DEFENDANT

**MEMORANDUM OPINION**

I.     **Factual and Procedural Background**

Plaintiff, Bertha Baltazar, appeals from the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for supplemental security income benefits ("SSI"), pursuant to § 1602 of Title XVI of the Social Security Act, 42 U.S.C. § 1381a ("the Act").

At the time Plaintiff's SSI application was filed, she was 39 years old with a high school education and some college courses.  Tr. 48, 108.  She has past relevant work as a stocker/checker. Tr. 48, 103.  Plaintiff protectively filed her SSI application on May 22, 2007, alleging a disability onset date of March 1, 2006, due to arthritis, Type II diabetes, and depression.  Tr. 41, 85-87, 97-100, 102.

Plaintiff's SSI application was denied at the initial and reconsideration levels.  Tr. 51-54, 57-58.  At her request, an administrative hearing was held on December 22, 2008.  Tr. 7-35.  The Administrative Law Judge ("ALJ") rendered an unfavorable decision on June 2, 2009, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. 38-50.  Subsequently, the Appeals Council denied Plaintiff's Request for Review on October 22, 2009, thus making the ALJ's decision

-1-

the final decision of the Commissioner.  Tr. 1-5.  Plaintiff now seeks judicial review of that decision.

## II.   <u>Medical History</u>

Plaintiff has a history of Type II diabetes, rheumatoid arthritis, and depression.  In November 2006, Plaintiff underwent rotator cuff repair surgery on her right shoulder.  Tr. 188, 198, 256-74. Frankie Griffin, M.D., noted that Plaintiff's right shoulder was "much improved" compared to her pre-operative status and Plaintiff was very pleased with the outcome of her surgery.  Tr. 187. Following surgery, Plaintiff received physical therapy, which she was somewhat compliant with. Tr. 188, 229-47.

In May 2007, Plaintiff began complaining of left shoulder and joint pain.  Tr. 184-85, 345. An MRI of Plaintiff's left shoulder revealed no evidence of a rotator cuff tendon tear, although possible bursitis was noted.  Tr. 183, 199.  Dr. Griffin suggested physical therapy three times per week for six weeks.  Tr. 183.  He also noted that Plaintiff was seeing a rheumatologist for her joint pain.  Tr. 183.

Plaintiff was initially referred to Russell Branum, M.D., to evaluate her high sedimentation rate and joint pain.  Tr. 169, 172.  Dr. Branum treated Plaintiff from September 2006 through June 2007.  Tr. 160-81.  On September 18, 2006, Plaintiff exhibited good range of motion in the left shoulder, elbows, wrists, hands, and metacarpophalangeal ("MCP"), proximal interphalangeal ("PIP"), and distal interphalangeal ("DIP") joints.  Tr. 169-70.  Dr. Branum noted decreased abduction and pain with range of motion in the right shoulder.  Tr. 170.  He also noted minimal crepitation of the knees on range of motion.  Tr. 170.  X-rays of Plaintiff's knees revealed no significant abnormalities.  Tr. 170.  Previous back x-rays were unremarkable by report. Tr. 170. Plaintiff had tried several pain medications, including Ultram and Lodine, which had become

-2-

ineffective over time.  Tr. 169.  Dr. Branum ordered further testing and prescribed Mobic for Plaintiff's chronic back pain.  Tr. 170, 380.  On May 16, 2007, Dr. Branum noted that Plaintiff's labs were consistent with rheumatoid arthritis, for which he gave a trial of Methotrexate[1] and Hydrocodone for pain.  Tr. 164, 177, 377-78.  On May 22, 2007, Dr. Branum noted ongoing synovitis of the ankles, hands, and MCP joints.  Tr. 163.  At a follow-up appointment, he noted that Plaintiff was doing well on Methotrexate and increased her dosage.  Tr. 161, 376.  Physical examination revealed MCP synovitis and trace wrist synovitis.  Tr. 161, 376.  Plaintiff discussed disability with Dr. Branum, and it was his opinion that she would not likely qualify based on her rheumatoid arthritis alone, but could possibly qualify based on a combination of factors.  Tr. 161, 376.

On October 31, 2007, Dr. Branum completed an Attending Physician's Statement in which he indicated that Plaintiff's joint pain and inflammation would interfere with her attention and concentration, would require unscheduled breaks during an eight-hour work shift, and would cause Plaintiff to miss more than four days of work per month.  Tr. 603.  Additionally, he found that Plaintiff could not perform simple grasping, pushing and pulling, or fine manipulation with either hand, could not use her feet repetitively to operate foot controls, could not bend, squat, crawl, climb, stoop, crouch, or kneel, and could only occasionally reach above her head.  Tr. 603.

In March 2007, Plaintiff began receiving counseling at Western Arkansas Counseling and Guidance Center ("WACGC").  Tr. 206-22.  Plaintiff presented with complaints of grief and loss, anger, dependency problems and passivity.  Tr. 206.  Plaintiff reported a very positive upbringing,

---

[1] Methotrexate is a medicine that inhibits the metabolism of certain types of cells.  It is used to treat certain cancers, rheumatoid arthritis, and severe psoriasis.  PDR HEALTH, http://www.pdrhealth.com/drugs/rx/rx-mono.aspx? contentFileName=met1257.html&contentName=Methotrexate&contentId=482 (last visited January 13, 2011).

but had recently gone through a divorce and lost her parents.  Tr. 206.  She was a stay-at-home mother during her marriage and had only recently worked three or four months at a local store.  Tr. 207.  When asked about school, Plaintiff stated she graduated from high school and took some college courses.  Tr. 206.

Plaintiff was alert and oriented.  Tr. 208.  Attention and concentration were normal, and memory was intact.  Tr. 208.  Plaintiff's thought processes were egocentric and her mood was depressed with irritability and anger factors.  Tr. 208.  Insight was good, and judgment was fair to good.  Tr. 208.  Her intelligence was estimated to be in the average to above average range.  Tr. 208.  Gary Greenwood, Plaintiff's counselor, diagnosed her with major depressive disorder, recurrent, severe and personality disorder, NOS, with passive/aggressive traits as well as dependency issues.  Tr. 209.  Greenwood estimated Plaintiff's Global Assessment of Functioning ("GAF") score at 50 and gave her a positive prognosis, noting that she was reasonably motivated for treatment.  Tr. 209.

While receiving counseling at WACGC, Plaintiff saw Jaymal Patel, M.D., for medical management of her depression.  Tr. 210-12.  Dr. Patel prescribed Zoloft for Plaintiff's depression.  Tr. 211.  On April 17, 2007, he found that Plaintiff was pleasant, clam, and cooperative.  Tr. 211.  Her thought processes were goal-directed, although she displayed a depressed mood and constricted range.  Tr. 211.  She was alert and oriented to time, place, person and situation, and she showed fair insight and intact judgment and cognition.  Tr. 211.  Plaintiff had a good fund of knowledge.  Tr. 211.  Dr. Patel diagnosed Plaintiff with major depressive disorder, moderate to severe without psychosis.  Tr. 211.  He estimated her GAF score at 55.  Tr. 211.  At some point during treatment, Dr. Patel completed a Physician Certification form indicating Plaintiff's condition qualified for a diagnosis of "serious mental illness," as Plaintiff met the diagnostic criteria for major depression

-4-

within the last year and lacked a legitimate productive role, had a serious role impairment in her main productive role, and had serious interpersonal impairment as a result of being totally socially isolated, lacking intimacy in social relationships, showing inability to confide in others, and lacking social support. Tr. 217. In May and June 2007, Plaintiff reported she was doing better in terms of depression. Tr. 215, 395. She stated that her sleep, energy, and appetite had improved dramatically and Methotrexate had improved her pain levels. Tr. 395. At the end of treatment, Plaintiff's estimated GAF score was 65. Tr. 396. At her final appointment in September 2007, Plaintiff stated that she "was happy and had received all the assistance she needed." Tr. 398. Dr. Patel discharged Plaintiff and noted that she had achieved all her goals. Tr. 402.

In a Psychiatric Review Technique dated July 25, 2007, Paul Cherry, Ph.D., considered Listing 12.04 (Affective Disorders), but determined that Plaintiff did not satisfy the diagnostic criteria. Tr. 350-63. Dr. Cherry found that Plaintiff did not satisfy the "B" criteria, as she had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation, each of extended duration. Tr. 360. He also found that the "C" criteria were not met. Tr. 361. Dr. Cherry also completed a Mental Residual Functional Capacity ("RFC") Assessment in which he found Plaintiff moderately limited in her ability to understand, remember, and carry out detailed instructions and interact appropriately with the general public. Tr. 372-74. He found that Plaintiff was not significantly limited in all other categories. Tr. 372-74.

In a Physical RFC Assessment dated July 25, 2007, J. Pataki, M.D., reviewed Plaintiff's medical records and determined that she could occasionally lift/carry twenty pounds, frequently lift/carry ten pounds, stand/walk/sit for a total of six hours in an eight-hour workday, and push/pull

an unlimited amount, other than as shown for lift/carry.  Tr. 364-71.  Additionally, Dr. Pataki found no postural, manipulative, visual, communicative, or environmental limitations.  TR. 364-69.

Plaintiff saw her primary care physician, Stephanie Frisbie, M.D., for management of her arthritis pain, diabetes, and depression.  Tr. 417-34.  Plaintiff was diagnosed with diabetes in August 2006.  Tr. 477-83.  In April 2007, Plaintiff's fasting sugars were 150-160 and her non-fasting sugars were 200-300.  Tr. 430.  In August and September 2007, Dr. Frisbee treated Plaintiff for pneumonia and associated wheezing and chest pain.  Tr. 454-75.  On October 3, 2007, Plaintiff's blood sugar ranged from 50-400.  Tr. 419.  At this time, she was taking Glyburide, Januvia, and Lantus to control her blood sugar level.  Tr. 419.  On October 19, 2007, Dr. Frisbie noted that Plaintiff's "sugars are getting better."  Tr. 417.  In April 2008, Plaintiff's glucose levels were still high and she was not attempting to lose weight or exercise.  Tr. 473.  At this time, she discontinued Zoloft because it was no longer effective.  Tr. 473.  She was given trials of several other antidepressants, including Cymbalta and Paxil.  TR. 473-75.  As of October 2008, Plaintiff's blood sugar levels were still uncontrolled.  Tr. 681.

Plaintiff was treated for pneumonia by Arturo Meade, M.D., at the Fort Smith Lung Center. Tr. 605.  After having difficulties resulting from pneumonia, Plaintiff had a CT of her chest performed, which yielded abnormal results.  Tr. 500, 626.  A mediastinoscopy with biopsy, performed on November 8, 2007, revealed enlarged, inflamed lymph nodes, but no evidence of a tumor. Tr. 522-23, 574-75. The pathology report was consistent with benign lymph node tissue with necrotizing granulomatous inflammation.  Tr. 568, 619.  Stains for acid fast bacilli and fungi were negative.  Tr. 619.  A follow-up chest x-ray taken on March 20, 2008, yielded normal results with no evidence of infection.  Tr. 530.  Plaintiff was advised to continue taking Methotrexate after briefly

-6-

discontinuing it due to her pneumonia complications.  Tr. 642-44.

On March 24, 2008, Plaintiff underwent repair of an incisional hernia that was related to a previous cholecystectomy.  Tr. 533.  On May 30, 2008, Plaintiff underwent excision of a hypertrophic scar, which resulted from her prior rotator cuff surgery.  Tr. 541-43.

On May 2, 2008, Plaintiff had an EKG performed due to chest pain.  Tr. 591.  Results were normal, but further testing was recommended due to numerous risk factors for coronary artery disease.  Tr. 591.  At this time, Plaintiff's medications included Gyburide, Lantus, and Januvia for diabetes, folic acid, Sertraline for depression, morphine, Triamterene/HCTZ for high blood pressure and fluid retention, and potassium gluconate.  Tr. 592.  Results of a nuclear stress test revealed a mild reversible perfusion defect involving the inferior wall of the left ventricle, which was possibly suggestive of myocardial ischemia.  Tr. 594-95, 887.

On July 28, 2008, Plaintiff underwent spirometry testing at Fort Smith Lung Center.  Tr. 638-40.  Results did not indicate any significant degree of obstructive pulmonary impairment or restrictive ventilatory defect.  Tr. 640.

On August 30, 2008, Plaintiff was hospitalized at Summit Medical Center for pneumonia.  Tr. 695-730.  An x-ray of Plaintiff's lungs revealed bibasilar infiltrates, greater on the right than the left.  Tr. 695, 721-24.  Results of a CT of Plaintiff's abdomen were consistent with right lower lobe pneumonia.  Tr. 726.  Plaintiff was discharged on September 3, 2008, in stable condition.  Tr. 695-730.

On September 25, 2008, Plaintiff saw Patricia Walz, Ph.D., for a mental evaluation.  Tr. 666-70.  Plaintiff presented with depression and panic attacks.  Tr. 666.  She had previously taken Zoloft, Cymbalta, and Paxil, which had lost effectiveness over time.  Tr. 667.  Plaintiff was currently on

-7-

Lexapro, which helped her depression "a little bit," although she still admitted having suicidal thoughts. Tr. 667. Plaintiff reported doing well in school. Tr. 667. She worked at Dollar General for four months as a cashier and stocker, but had to leave because two of her children were ill. Tr. 667. When asked about daily activities, Plaintiff stated she sometimes needed assistance, but was able to drive, do laundry, sweep, mop, cook complex meals, and do the dishes. Tr. 668-70. She also reportedly walked two or three miles twice a week for exercise. Tr. 668.

Dr. Walz described Plaintiff's mood and appearance as very sad with a flat affect. Tr. 669. Thought processes were slow but logical and goal-oriented and thought content was notable for daily suicidal ideation. Tr. 669. Dr. Walz diagnosed Plaintiff with major depression, recurrent, moderate to severe, without psychosis. Tr. 669. She also noted dependent traits. Tr. 670. Dr. Walz estimated Plaintiff's intelligence to be within the low average to average range and gave Plaintiff a GAF score of 45-50 based on her reported suicidal ideation. Tr. 669. Dr. Walz noted that Plaintiff's persistence was good, although she had trouble with concentration and speed of information processing due to depression. Tr. 670.

Dr. Walz completed two Medical Source Statements. On September 25, 2008, Dr. Walz found that Plaintiff was moderately limited in her ability to understand, remember, and carry out complex instructions, make judgments on complex work-related decisions, and interact appropriately with the public, supervisors and co-workers. Tr. 671-72. She found mild limitations in all other categories. Tr. 672. She specifically noted that Plaintiff's anhedonia affected her hygiene and ability to interact with others. Tr. 672. On November 3, 2008, Dr. Walz completed a second Medical Source Statement, in which she found Plaintiff markedly limited in her ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, complete

-8-

a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 157-59, 690-92. She found that Plaintiff was moderately limited in all other categories, except she was not significantly limited in her ability to make simple work-related decisions and ask simple questions or request assistance. Tr. 157-59.

On December 2, 2008, Plaintiff presented to UAMS Endocrinology Clinic for a consultation concerning her uncontrolled diabetes. Tr. 732-68. At the time of evaluation, Plaintiff's blood sugars were consistently above 200, with the highest being 486. Tr. 733. Plaintiff was taking Januvia, Glyburide, and two daily injections of Humalog Mix for diabetes, Morphine Sulfate for pain, Methotrexate for rheumatoid arthritis, HCTZ for high blood pressure, Lexapro for depression, and folic acid. Tr. 735. Debra L. Simmons, M.D., recommended increasing Plaintiff's dosage of Humalog mix and encouraged weight loss. Tr. 734-35. Mildly elevated liver function tests were also noted. Tr. 750, 760.

Plaintiff was admitted to St. Edward's Mercy Medical Center for chest pain on December 10, 2008, and December 30, 2008. Tr. 771-76, 815-24. On December 10, 2008, Plaintiff's blood sugar level was over 300. Tr. 838, 845-46. She was also placed on a high dose sliding scale regimen of insulin and given Nexium. Tr. 820. A chest x-ray revealed elevation of the right hemidiaphragm, but no other abnormalities. Tr. 848. It was noted that the previous area of atelectasis and infiltrate from the left mid-lung (from September 2008) had since cleared. Tr. 848. On December 30, 2008, Plaintiff underwent a left heart catheterization, including a coronary angiogram and left ventriculogram. Tr. 773-74. Results revealed no significant coronary artery disease and preserved left ventricular systolic function, although elevated left ventricular end diastolic pressure was noted.

Tr. 774.  Plaintiff was prescribed Lisinopril and advised to lose weight.  Tr. 772-74.

Plaintiff went to a follow-up appointment with Dr. Branum on March 9, 2009.  Tr. 780.  Dr. Branum noted that Plaintiff was doing fairly well on Methotrexate, with only minimal synovitis.  Tr. 780.  He also found a "degree of fibromyalgia" on exam, for which he prescribed Neurontin.  Tr. 780.  Dr. Branum also recommended a sleep study to rule out sleep apnea.  Tr. 780.

In January 2009, Plaintiff began treatment at Arkansas Heart Center.  Tr. 892-96.  Plaintiff was thought to have microvascular angina, which likely caused her continual chest pain.  Tr. 895-96.  Ronald Kantola, D.O., recommended weight loss and keeping control of her diabetes, blood pressure, and cholesterol.  Tr. 895.  She was switched from HCTZ to Maxzide in order to increase her potassium level.  Tr. 894.  In March 2009, Plaintiff underwent a hysterectomy.  Tr. 788-89.  At a follow-up appointment with Dr. Kantola, he prescribed Pravastatin to reduce Plaintiff's cholesterol and enrolled her in extracorporal counterpulsation ("ECP") therapy.  Tr. 892-93.

In 2009, Plaintiff was treated at St. Edward Mercy Clinic for foot pain as well as wrist pain after a fall.  Tr. 917-39.  X-rays of Plaintiff's right ankle revealed a small dorsal calcaneal spur, but no fractures or other abnormalities.  Tr. 936.  Similarly, x-rays of Plaintiff's right hand showed no fractures, dislocations, or other significant abnormalities.  Tr. 938.  At this time, Plaintiff's list of medications included Methotrexate, folic acid, Neurontin, Zestril, Nitroglycerin, Maxzide, Januvia, Glyburide, Lexapro, Tramadol, MS Contin, baby aspirin, Symbicort, Albuterol, iron and potassium supplements, Pravastatin, and Humalog and Levimir insulin.  Tr. 917.

## III.   Applicable Law

The Court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole.  *Ramirez v. Barnhart*, 292 F.3d 576, 583

(8th Cir. 2003). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support a conclusion." *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)). In determining whether evidence is substantial, the Court considers both evidence that detracts from the Commissioner's decision as well as evidence that supports it. *Craig v. Apfel*, 212 F.3d 433, 435-36 (8th Cir. 2000) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). If, after conducting this review, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Secretary's] findings," then the decision must be affirmed. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (quoting *Siemers v. Shalala*, 47 F.3d 299, 301 (8th Cir. 1995)).

To be eligible for disability insurance benefits, a claimant has the burden of establishing that he is unable to engage in any substantial gainful activity due to a medically determinable physical or mental impairment that has lasted, or can be expected to last, for no less than twelve months. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); 42 U.S.C. § 423(d)(1)(A). The Commissioner applies a five-step sequential evaluation process to all disability claims: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits his physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work; and (5) if the claimant cannot perform his past work, the burden of production then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform given his age, education, and work experience. *Pearsall*, 274 F.3d at 1217; 20 C.F.R. § 404.1520(a), 416.920(a). If a claimant fails to meet the criteria at any step in the

-11-

evaluation, the process ends and the claimant is deemed not disabled. *Eichelberger v. Barnhart*, 390

F.3d 584, 590-91 (8th Cir. 2004).

**IV.**   <u>**Discussion**</u>

  At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity

since May 22, 2007, the application date.  Tr. 43.  At step two, he determined that Plaintiff suffered

from arthritis, diabetes mellitus, depression and anxiety, all of which were considered severe

impairments under the Act.  Tr. 43.  At step three, the ALJ determined that Plaintiff did not have an

impairment or combination of impairments that met or medically equaled a listed impairment.  Tr.

43-45.  At step four, he found that Plaintiff retained the RFC to perform sedentary work except that

she can sit for about six hours and stand/walk for at least two hours during an eight-hour workday,

occasionally climb, balance, stoop, kneel, crouch, and crawl, frequently perform handling and

fingering manipulations and occasionally reach overhead, and perform unskilled work where

interpersonal skills are incidental to the work performed.  Tr. 45-48.  At step five, the ALJ

determined that Plaintiff could perform the requirements of representative occupations such as

Assembler, of which there are 63,308 jobs nationally and 1,111 jobs regionally, Addressor, of which

there are 24,970 jobs nationally and 183 jobs regionally, and Escort Vehicle Driver, of which there

are 139,021 jobs nationally and 1,727 jobs regionally.  Tr. 48-49.  Thus, the ALJ concluded that

Plaintiff had not been under a disability, as defined by the Act, at any time since the application date.

Tr. 49.

  Plaintiff contends that the ALJ erred by disregarding her treating physician's opinion.  Pl.'s

Br. 10-19.  We agree.  A treating physician's opinion is given controlling weight if it "is well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is not

-12-

inconsistent with the other substantial evidence" in a clamant's record. *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009); 20 C.F.R. § 404.1527(d)(2). The record must be evaluated as a whole to determine whether the treating physician's opinion should be controlling. *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005). A treating physician's evaluation may be disregarded where other medical assessments "are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Id.* at 920-21 (quoting *Prosch*, 201 F.3d at 1013). In any case, an ALJ must always "give good reasons" for the weight afforded to the treating physician's opinion. 20 C.F.R. § 404.1527(d)(2).

In making his RFC determination, the ALJ stated:

> As for the opinion evidence, significant weight is given to the opinion of treating physicians Dr. Griffin and Dr. Branum . . . The claimant's rheumatologist, Dr. Branum, indicated the claimant was doing well on the prescription Methotrexate. Dr. Branum also noted the claimant does not qualify for disability based solely on her arthritic condition. . . In sum, the above residual functional capacity assessment is supported by the objective medical evidence of record and the opinions of treating physicians Dr. Griffin and Dr. Branum. Dr. Griffin's and Dr. Branum's findings are also consistent with the opinions of the State agency consultants.

Tr. 47-48. Substantial evidence does not support this conclusion. First, the ALJ specifically mentioned Dr. Branum's June 2007 note that Plaintiff would not likely qualify for disability based on rheumatoid arthritis alone. Tr. 161, 376. However, he made no mention of the extremely limiting RFC assessment Dr. Branum completed four months later. Tr. 603. This was error. Although the ALJ need not discuss all of the evidence in the record, he may not ignore evidence that does not support his decision, especially when that evidence is significant. *See Pates-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (citing *Berryhill v. Barnhart*, 64 Fed. Appx. 196, 199-200 (10th Cir. 2003)). Dr. Branum's physical RFC assessment is the only assessment completed by a treating physician. As such, the ALJ should have specifically discussed and given "good reasons" for the

weight afforded it.

Additionally, we are troubled by the ALJ's conclusion that his RFC assessment comports with Dr. Branum's opinion and Dr. Branum's opinion is in accordance with the Agency consultant's opinion.  Tr. 47-48.  If given controlling weight, Dr. Branum's RFC assessment would have been disabling.  Tr. 32-34.  Dr. Branum found that Plaintiff could not perform simple grasping, pushing and pulling, or fine manipulation with either hand, could not use her feet repetitively to operate foot controls, could not bend, squat, crawl, climb, stoop, crouch, or kneel, and could only occasionally reach above her head.  Tr. 603.  By contrast, Dr Pataki found no postural or manipulative limitations and the ALJ found that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl and frequently perform handling and fingering manipulations.  Tr. 45, 364-69.  Thus, without further clarification, we cannot account for the ALJ's seemingly contradictory conclusion.   For these reasons, we find that remand for further development of this case is warranted.  On remand, the ALJ should consider the conflicting evidence, reassess Plaintiff's RFC, and give specific reasons for the weight afforded to her treating physicians.

**V.**     **Conclusion**

Accordingly, we conclude that the ALJ's decision is not supported by substantial evidence and should be reversed and remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

ENTERED this 18th day of January 2011.

*/s/ J. Marschewski*

HON. JAMES R. MARSCHEWSKI
CHIEF U.S. MAGISTRATE JUDGE

-14-